Emrich Enters., LLC v. Hornwood, Inc., 2020 NCBC 29.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 5659

EMRICH ENTERPRISES, LLC,
individually and derivatively on
behalf of TRIANGLE AUTOMOTIVE
COMPONENTS, LLC,

        Plaintiff,

v.

HORNWOOD, INC.,

        Defendant,

v.

TRIANGLE AUTOMOTIVE
COMPONENTS, LLC,

        Defendant and
        Nominal Defendant.

**ORDER AND OPINION ON
DEFENDANTS' PARTIAL
MOTION TO DISMISS**

1.     **THIS MATTER** is before the Court on Defendants' Partial Motion to Dismiss (the "Motion") filed on August 21, 2019.  (ECF No. 63.)

2.     For the reasons set forth herein, the Court **DENIES** the Motion.

*Ellis & Winters LLP by Jonathan D. Sasser, Stephen D. Feldman,[1] and Michelle A. Liguori, for Plaintiff.*

*Moore & Van Allen, PLLC by Mark A. Nebrig and Kaitlin M. Price for Defendants.*

Robinson, Judge.

---

[1] At the time of briefing and oral arguments on the Motion, Mr. Stephen D. Feldman ("Mr. Feldman") represented Plaintiff Emrich Enterprises, LLC as legal counsel.  After oral arguments on February 27, 2020, Mr. Feldman requested that the Court permit him withdraw as counsel. (ECF No. 80.)  The Court granted Mr. Feldman's request on March 3, 2020, and Mr. Feldman is effectively no longer counsel of record in the above-captioned litigation. (ECF No. 82.)  Mr. Jonathan D. Sasser and Ms. Michelle A. Liguori remain counsel of record for Plaintiff Emrich Enterprises, LLC.

# I.    INTRODUCTION

3.    This action arises out of a dispute between Plaintiff Emrich Enterprises, LLC ("Emrich Enterprises") and Defendant Hornwood, Inc. ("Hornwood") as member-managers of a North Carolina limited liability company, Triangle Automotive Components, LLC ("Triangle," and with Hornwood collectively referred to herein as "Defendants"). Emrich Enterprises contends that Hornwood attempted to unilaterally withdraw from Triangle contrary to the terms of Triangle's operating agreement. Emrich Enterprises also contends that after being enjoined from withdrawing from Triangle by this Court, Hornwood has subsequently mismanaged Triangle in order to benefit itself.

# II.    FACTUAL BACKGROUND

4.    The Court does not make findings of fact for the purposes of a motion to dismiss, but only recites or summarizes those factual allegations contained in the operative pleading, which are accepted as true, that are relevant and necessary to the Court's determination of the Motion.[2]

## A.    The Parties

5.    Emrich Enterprises is a North Carolina limited liability company with its principal office in Raleigh. (First Am. Verified Compl. ¶ 14, ECF No. 56 ["Am. Compl."].)

---

[2] "Absent a request by one of the parties, the trial court is not required to make findings of fact when ruling a motion" to dismiss. *Cameron-Brown Co. v. Daves*, 83 N.C. App. 281, 285, 350 S.E.2d 111, 114 (1986). The appellate courts will presume that the trial court found sufficient facts to support its ruling. *Id.*

6.      Hornwood is a North Carolina corporation with its principal office in Lilesville.  (Am. Compl. ¶ 15.)  Chuck Horne is Hornwood's Chief Executive Officer ("Horne").  (Am. Compl. ¶ 43.)

7.      Triangle is a North Carolina limited liability company with its principal office in Lilesville.  (Am. Compl. ¶ 15.)   Triangle is in the business of manufacturing and selling automotive textile products for passenger and commercial vehicles.  (Am. Compl. ¶ 1.)

8.      Emrich Enterprises is the minority member of Triangle, with a membership interest of approximately forty-seven percent (47%).  (Am. Compl. ¶ 14.)  Hornwood is the majority and controlling member of Triangle, with a membership interest of about fifty-three percent (53%).  (Am. Compl. ¶ 16.)  Hornwood controls Triangle's finances.  (Am. Compl. ¶¶ 47, 127.)

B.      **Triangle's Operations**

9.      On February 28, 2006, Emrich, Hornwood, and Bondtex, Inc. ("Bondtex"), who is not a party to this litigation, entered into an operating agreement (the "Operating Agreement") to govern Triangle's operations.  (Am. Compl. ¶ 33; *see also* Am. Compl. Ex. 1, ECF No. 56.1 [the "Operating Agreement"].)  Emrich Enterprises, Hornwood, and Bondtex also entered into a joint venture agreement dated April 28, 2006 (the "Joint Venture Agreement").  (Am. Compl. ¶ 38; *see also* Am. Compl. Ex. 2, ECF No. 56.2 [the "Joint Venture Agreement"].)  At some point after signing the Operating Agreement and the Joint Venture Agreement, Bondtex withdrew from Triangle.  (*See* Am. Compl. ¶ 29.)

10. When Triangle was founded in 2006, Hornwood and Emrich Enterprises agreed to a certain division of labor. (Am. Compl. ¶ 29.) Aside from the division of Bondtex's responsibilities after it withdrew from Triangle, Emrich Enterprises and Hornwood's responsibilities have remained the same since 2006. (Am. Compl. ¶ 29.)

11. Hornwood manufactures the fabric that Triangle sells and performs certain non-manufacturing services. (Am. Compl. ¶ 28.) Hornwood also owns the facilities at which Triangle's products are manufactured. (Am. Compl. ¶ 30.) Emrich Enterprises performs functions related to Triangle's business development, including sales and marketing services. (Am. Compl. ¶¶ 28, 118.) Emrich Enterprises does not have manufacturing facilities or the ability to perform Hornwood's manufacturing and non-manufacturing responsibilities. (Am. Compl. ¶ 31.)

12. Triangle is a supplier for automobile companies, including Daimler, GM, and Fiat Chrysler. (Am. Compl. ¶ 23.) In the automotive industry, suppliers are awarded "programs" to supply component parts for automobiles. (Am. Compl. ¶ 25.) Under the programs, the manufacturers usually give Triangle their projected needs on a six-month basis, and Triangle then meets those supply needs during that period of time. (Am. Compl. ¶ 26.)

13. The approval process for being awarded these programs usually takes six to nine months and requires approval by the automobile manufacturers' engineers. (Am. Compl. ¶ 25.) Any change Triangle makes in its manufacturing process also requires approval by the automobile manufacturer's engineers. (Am. Compl. ¶ 25.)

## C. Triangle's Lawsuit and its Settlement Proceeds

14. In 2015, Triangle sued one of its former sales agents, who had acquired Bondtex, for breach of contract and related claims (the "Lawsuit"). (Am. Compl. ¶ 42.) In September 2018, the Lawsuit was settled favorably for Triangle. (Am. Compl. ¶ 44.)

15. Emrich Enterprises and Hornwood, comprising 100% of the membership interests of Triangle, agreed that Triangle would distribute the Lawsuit's settlement proceeds with approximately fifty-two percent (52%) being distributed to Hornwood and approximately forty-eight percent (48%) being distributed to Emrich Enterprises. (Am. Compl. ¶¶ 14, 16, 45.)

16. In October 2018, Triangle distributed approximately seventy-eight percent (78%) of Emrich Enterprises' share of the settlement proceeds to Emrich Enterprises. (Am. Compl. ¶ 46.) Emrich Enterprises, Hornwood, and Triangle agreed that Triangle would retain the remainder of Emrich Enterprises' share of the settlement proceeds until the end of 2018 to ensure that Triangle could pay its liabilities for that year. (Am. Compl. ¶ 46.)

17. Emrich Enterprises has made multiple requests for the remainder of its share of the Lawsuit's settlement proceeds, but Triangle has refused to make such payment. (Am. Compl. ¶ 46.) Hornwood controls Triangle's finances and has caused Triangle to wrongfully withhold Emrich Enterprises' share of the settlement proceeds. (Am. Compl. ¶ 47.)

18.   As part of the settlement of the Lawsuit, Hornwood and Emrich Enterprises consented to Bondtex's withdrawal from Triangle.  (Am. Compl. ¶ 48.)  Prior to its withdrawal, Bondtex provided lamination services for Triangle.  (Am. Compl. ¶ 49.)  Triangle hired a contract laminator, C.H. Mueller ("Mueller"), to provide Triangle with lamination services as a successor to and replacement for Bondtex providing these services.  (Am. Compl. ¶ 51.)

19.   Emrich Enterprises and Hornwood agreed that Hornwood would oversee the transition from Bondtex to Mueller.  (Am. Compl. ¶ 51.)  However, Hornwood failed to timely transition the lamination services to Mueller, requiring Triangle to continue to use Bondtex's lamination services.  (Am. Compl. ¶¶ 52–53.)  Bondtex charges substantially more than Mueller and the continued use of Bondtex's lamination services has resulted in reduced Triangle profits by tens of thousands of dollars per month.  (Am. Compl. ¶¶ 54, 57.)

20.   Hornwood's failure to properly oversee the lamination transition is a byproduct of its intensive work with a competitor of Triangle.  (Am. Compl. ¶ 67.)

### D.   Hornwood's Alleged Competitive Misconduct

21.   Borgstena, similar to Triangle, is a textile company in the business of manufacturing and selling automotive textile products for suppliers of automobile manufacturers.  (Am. Compl. ¶¶ 6, 68.)  Borgstena is a competitor of Triangle.  (Am. Compl. ¶¶ 6, 67.)

22.   Beginning in September 2017, Hornwood began working with Borgstena.  (Am. Compl. ¶ 6.)  On or before that date, Borgstena contacted Horne to discuss

Hornwood making seating and headliner fabric for an automobile manufacturer. (Am. Compl. ¶ 69.) Horne provided Borgstena with a "company profile" for Hornwood. (Am. Compl. ¶ 69.)

23. In November 2017, Hornwood and Borgstena entered into a nondisclosure agreement with the intent of working together on product development. (Am. Compl. ¶ 70.) Hornwood never disclosed this agreement to Emrich Enterprises or suggested that Triangle should be a party to the agreement. (Am. Compl. ¶ 70.)

24. In February 2018, Horne, and another Hornwood principal, visited Borgstena's manufacturing facility in Portugal. (Am. Compl. ¶ 73.) Hornwood never informed Emrich Enterprises of Hornwood's plans to send its representatives to Borgstena's Portugal facility. (Am. Compl. ¶ 73.)

25. After Horne's visit to Borgstena's Portugal facility, Hornwood began communicating weekly with Borgstena regarding product-development issues. (Am. Compl. ¶ 74.) Hornwood and Borgstena discussed product development with at least three automobile manufacturers, one of which is a customer of Triangle. (Am. Compl. ¶¶ 71–72, 75–76.)

26. After the Lawsuit was initiated and while the Lawsuit was pending, Triangle, at the advice of Hornwood's leadership, scaled back its efforts to secure new programs. (Am. Compl. ¶ 78.) Horne represented that automobile manufacturers would not grant new programs to a supplier that was involved in litigation. (Am. Compl. ¶ 78.) However, during this time, Hornwood was actively engaging in product-development efforts with Borgstena. (Am. Compl. ¶¶ 76, 78.)

27. After the Lawsuit was settled in 2018, Hornwood and Emrich Enterprises discussed efforts to secure new business for Triangle. (Am. Compl. ¶ 79.) Before Emrich Enterprises became aware of the work Hornwood was doing with Borgstena, John Emrich ("Mr. Emrich"), of Emrich Enterprises, suggested to Horne that Triangle contact Borgstena regarding a joint development, sales, and supply agreement between Triangle and Borgstena. (Am. Compl. ¶¶ 82, 88, 97.) Borgstena's CEO declined this offer. (Am. Compl. ¶ 82.) The offer purportedly made by Horne to Borgstena's CEO was a "charade" and Hornwood had no intention of pursuing a partnership with Borgstena as a member of Triangle. (Am. Compl. ¶ 82.)

28. On January 1, 2019, Borgstena Textile North America, LLC was formed and organized as a North Carolina limited-liability company. (Am. Compl. ¶ 84.) During January 2019, Hornwood informed Borgstena of an opportunity to purchase a textile plant in North Carolina. (Am. Compl. ¶ 85.)

29. On March 5, 2019, Hornwood and Borgstena met with the director of the Anson County Economic Development Partnership. (Am. Compl. ¶ 86.) Borgstena, through Borgstena Textile North America, LLC, is opening a facility in Anson County, where Horwood's facilities are located. (Am. Compl. ¶¶ 86–87.)

30. While discussing product development with Borgstena, Hornwood disclosed to Borgstena representatives Triangle's confidential product information. (Am. Compl. ¶¶ 89–95.) Horne admitted by e-mail to Borgstena's CEO that Hornwood's work with Borgstena violates the provisions of the Operating Agreement. (Am. Compl. ¶ 96.)

31.     Hornwood did not tell Emrich Enterprises about its product-development efforts with Borgstena until it was disclosed in discovery in this litigation.  (Am. Compl. ¶ 88.)

**E.     Hornwood's Proposed Changes to the Operating Agreement**

32.     On March 4, 2019, Triangle held a members meeting.  (Am. Compl. ¶ 97.) Horne and Wesley Horne (collectively referred to herein as the "Hornes") attended for Hornwood and Mr. Emrich and Martha Miller ("Ms. Miller") attended for Emrich Enterprises.  (Am. Compl. ¶ 97.)

33.     Before the March 4 meeting, Emrich Enterprises and Hornwood discussed adjusting their respective membership interests in Triangle and eliminating Emrich Enterprises' sales commissions.  (Am. Compl. ¶ 98.)

34.     The Hornes also proposed a new governing document for Triangle.  (Am. Compl. ¶ 99.)  Emrich Enterprises contends that the proposed document eliminated the majority of the terms in the Operating Agreement and the Joint Venture Agreement.  (Am. Compl. ¶ 99.)  Mr. Emrich and Ms. Miller did not agree to the terms of the proposed agreement and refused to sign it.  (Am. Compl. ¶ 99.)

35.     At the March 4 meeting, Hornwood informed Emrich Enterprises that Hornwood planned to do business with Borgstena.  (Am. Compl. ¶ 100.)  Hornwood then acknowledged that the Operating Agreement prohibited it from doing business with Borgstena; therefore, Hornwood needed to discontinue its affiliation with Emrich Enterprises in order to work with Borgstena.  (Am. Compl. ¶ 100.)

36.     Hornwood offered to buy Emrich Enterprises' membership share in Triangle, but Hornwood's offer undervalued Emrich Enterprises' interest.  (Am. Compl. ¶ 101.)  Alternatively, Hornwood offered to sell its membership interest in Triangle to Emrich Enterprises.  (Am. Compl. ¶ 102.)  Emrich Enterprises declined this offer because it lacks the manufacturing capabilities that Hornwood provides and is not able to operate Triangle without Hornwood.  (Am. Compl. ¶¶ 102, 106–10.)

37.     At the end of the March 4 meeting, Hornwood provided Emrich Enterprises a notice of its intent to withdraw from Triangle in sixty (60) days.  (Am. Compl. ¶ 103.)  Notwithstanding Hornwood's notice, in the weeks after the conclusion of the March 4 meeting, Emrich Enterprises and Hornwood communicated on multiple occasions regarding Hornwood's offer to purchase Emrich Enterprises' interest in Triangle.  (Am. Compl. ¶ 104.)

**F.     Hornwood Threatens to Withdraw from Triangle**

38.     On April 16, 2019, Horne, by letter, again expressed Hornwood's interest in purchasing Emrich Enterprises' share of Triangle.  (Am. Compl. ¶ 105.)  However, Horne communicated that if Emrich Enterprises did not agree to sell its share of Triangle, Hornwood would withdraw from Triangle as of May 2, 2019 and stop performing its manufacturing duties.  (Am. Compl. ¶ 105; *see also* Am. Compl. Ex. 6, ECF No. 56.6.)

39.     On April 24, 2019, Hornwood sent a letter to Emrich Enterprises, withdrawing its offer to purchase Emrich Enterprises' interest in Triangle and reiterating its intent to withdraw from Triangle.  (Am. Compl. ¶ 113.)  The next day,

on April 25, 2019, Hornwood sent an e-mail to Emrich Enterprises threatening to inform Triangle's customers of Hornwood's withdrawal. (Am. Compl. ¶ 114.)

40. On May 31, 2019, the Court entered the Order on Amended Motion for Preliminary Injunction, prohibiting Hornwood from withdrawing from Triangle (the "Preliminary Injunction"). (Order Am. Mot. Prelim. Inj. ¶ 75, ECF No. 40 ["Prelim. Inj."].)

41. After the Court entered the Preliminary Injunction, Hornwood initiated several actions "designed to cripple Triangle." (Am. Compl. ¶ 117.)

**G.   Additional Alleged Misconduct by Hornwood**

42. In exchange for Emrich Enterprises providing sales and marketing services, Triangle agreed to pay Emrich Enterprises a monthly commission on Triangle's sales. (Am. Compl. ¶¶ 118, 120.) This agreement was made part of the Joint Venture Agreement. (Am. Compl. ¶ 120; *see also* Joint Venture Agreement ¶¶ 2(c), 3(a).)

43. Beginning in January 2013, Triangle paid Emrich Enterprises a two-percent commission on a regular basis. (Am. Compl. ¶ 125.) After Emrich Enterprises initiated this lawsuit, Hornwood caused Triangle to stop paying commissions to Emrich Enterprises. (Am. Compl. ¶¶ 126–27.)

44. Additionally, on June 10, 2019, Hornwood unilaterally approved an unprecedented price increase for fabric manufactured and sold by Hornwood to Triangle, which will cost Triangle more than $200,000 a year. (Am. Compl. ¶¶ 128, 130–32.)

45. The Joint Venture Agreement requires Hornwood to charge Triangle at cost for the fabric it manufactures for Triangle. (Am. Compl. ¶ 129.) Emrich Enterprises requested that Hornwood produce documents to support the proposition that the increased prices represented Hornwood's actual costs. (Am. Compl. ¶ 133.)

46. Hornwood has not provided credible documentation to justify the price increases. (Am. Compl. ¶¶ 134, 140.) The documentation provided by Hornwood suggests that the price increases are a device to achieve Hornwood's desired separation from Emrich Enterprises. (Am. Compl. ¶¶ 134–40.)

47. On June 24, 2019, Hornwood informed Emrich Enterprises that Hornwood, for the first time since Triangle's inception, would start billing Triangle for Hornwood's non-manufacturing services. (Am. Compl. ¶ 143.) Hornwood stated that it was "no longer willing to handle [Triangle's] customer service, accounting, and other non-manufacturing tasks" if Hornwood was not paid for its non-manufacturing services. (Am. Compl. ¶ 145.)

48. After the Court entered the Preliminary Injunction prohibiting Hornwood from unilaterally withdrawing from Triangle, Hornwood has attempted to use its status as controlling member of Triangle to divert Triangle profits to Hornwood, stop the flow of profits from Triangle to Emrich Enterprises, and otherwise cripple Triangle. (Am. Compl. ¶¶ 117, 147.)

## III. PROCEDURAL BACKGROUND

49. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

50.     Emrich Enterprises initiated this action by filing a Verified Complaint on April 29, 2019 (the "First Complaint").  (ECF No. 3.)  The action was designated as a mandatory complex business case that same day, (ECF No. 1), and assigned to the undersigned on April 30, 2019, (ECF No. 2).

51.     On May 21, 2019, Emrich Enterprises filed an Amended Motion for Preliminary Injunction.  (ECF No. 27.)  The Court entered the Preliminary Injunction on May 31, 2019.  (ECF No. 40.)

52.     As of right, Emrich Enterprises filed the First Amended Verified Complaint on July 22, 2019 (the "FAVC").

53.     Hornwood and Triangle filed the Motion and brief in support thereof on August 21, 2019.  (Defs.' Mem. Supp. Partial Mot. Dismiss Pl.'s First Am. Verified Compl., ECF No. 64 ["Br. Supp."].)  Briefing was timely completed, and the Court held a hearing on the Motion on February 19, 2020.  (*See* ECF No. 78.)

54.     The Motion is ripe for resolution.

### IV.    LEGAL STANDARDS

#### A.    <u>Subject Matter Jurisdiction</u>

55.     A court shall dismiss the action when it appears that the court lacks subject matter jurisdiction.  N.C.G.S. § 1A-1, Rule 12(h)(3).  The plaintiff bears the burden of establishing subject matter jurisdiction.  *Harper v. City of Asheville*, 160 N.C. App.

209, 217, 585 S.E.2d 240, 245 (2003). "A motion to dismiss for lack of subject matter jurisdiction is not viewed in the same manner as a motion to dismiss for failure to state a claim upon which relief can be granted." *Tart v. Walker,* 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978). A court may consider matters outside the pleadings in determining whether subject matter jurisdiction exists. *Keith v. Wallerich*, 201 N.C. App. 500, 554, 687 S.E.2d 299, 302 (2009); *Tart,* 38 N.C. App. at 502, 248 S.E.2d at 737.

B. **Rule 12(b)(6)**

56. A motion to dismiss pursuant to Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Concrete Serv. Corp. v. Inv'rs Grp., Inc.,* 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the Complaint in the light most favorable to Plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."

*Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation omitted).

57.     Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC.*, 251 N.C. App. 198, 206, 794 S.E.2d 898, 903 (2016) (citation omitted).   The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment.  *Id.* (citation omitted).   Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001) (citation omitted).   Where the Court considers documents that are not specifically referred to, contained in, or attached to the complaint, the Rule 12(b)(6) motion will be converted into a Rule 56 motion and subject to its standards of consideration and review. *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890−91 (1979).[3] Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law

---

[3] For the purposes of Rule 12(b)(6), the Court is limited to its review of the relevant pleading, the FAVC, and any documents referred to in that pleading.  *Moch*, 251 N.C. App. at 206 S.E.2d at 903 (citation omitted).  While the Court may consider matters outside of the FAVC in determining whether it has subject matter jurisdiction over the parties or the claims, the Court limits its review for the purposes of Rule 12(b)(6), only considering appropriate matters of record. *See Estate of Belk v. Boise Cascade Wood Prods., L.L.C.*, 824 S.E.2d 180, 183 (N.C. Ct. App. 2019) ("[T]he trial court is not required to convert a motion to dismiss into one for summary judgment simply because additional documents are submitted. . . Where it is clear from the record, namely from the order itself, that the additional materials were not

supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615, 821 S.E.2d at 737 n.7 (citations omitted).

## V.    ANALYSIS

58.    The FAVC includes eight claims for relief. (*See* Am. Compl. ¶¶ 150–235.) Only the following six claims for relief are the subject of the Motion: (1) breach of contract, brought derivatively and directly, against Hornwood for violation of section 4.4. of the Operating Agreement (the "First Claim for Relief"); (2) breach of contract, brought derivatively and directly, against Hornwood for ceasing manufacturing for Triangle (the "Second Claim for Relief"); (3) breach of fiduciary duty, brought derivatively and directly, against Hornwood (the "Fourth Claim for Relief"); (4) breach of contract against Triangle for failure to pay settlement proceeds from the Lawsuit (the "Fifth Claim for Relief"); (5) breach of contract against Hornwood for failure to manufacture for Triangle at cost (the "Seventh Claim for Relief"); and (6) a

---

considered by the trial court, the 12(b)(6) motion is not converted into a Rule 56 motion." (internal quotation marks, brackets, and citation omitted).)

direct breach of fiduciary duty claim against Hornwood (the "Eighth Claim for Relief").[4] (*See* Br. Supp. 1–2.)

59.     Hornwood moves to dismiss the derivative claims asserted by Emrich Enterprises – the First, Second, and Fourth Claims for Relief – for lack of subject matter jurisdiction for Emrich Enterprises' failure to meet the pre-suit demand requirements as provided for in N.C.G.S. § 57D-8-01. (Br. Supp. 8–10.) However, on September 20, 2019, Emrich Enterprises voluntarily dismissed its Second Claim for Relief without prejudice. (Resp. Emrich Enterprises, LLC Defs.' Part. Mot. Dismiss 9, ECF No. 72 ["Resp. Br."].) Therefore, Defendants' Motion should be DENIED as MOOT to the extent it seeks dismissal of Emrich Enterprises' Second Claim for Relief.

60.     Hornwood also moves to dismiss the First and Seventh Claims for Relief pursuant to Rule 12(b)(1), contending that Emrich Enterprises lacks standing to assert the respective direct breach of contract claims against Hornwood. (Br. Supp. 15–16.)

61.     Hornwood also moves to dismiss Emrich Enterprises' direct breach of fiduciary duty claims, the Fourth and Eighth Claims for Relief, pursuant to Rule 12(b)(1) arguing that it does not owe Emrich Enterprises fiduciary duties. (Br. Supp. 11–14.) Hornwood also argues that the Fourth and Eighth Claims for Relief fail pursuant to Rule 12(b)(6) because Emrich Enterprises fails to allege that Hornwood breached any fiduciary duty owed or that any such breach caused damages. (Br. Supp. 16–19.)

---

[4] The Third and Sixth Claims for Relief, as defined by the FAVC, are not subject to the Motion. (*See* Am. Compl. ¶¶ 176–86, 207–16; *see also* Br. Supp. 1–2.)

62. Lastly, Hornwood and Triangle move to dismiss the direct breach of contract claims asserted against them incorporated in the First and Fifth Claims for Relief pursuant to Rule 12(b)(6). (Br. Supp. 19–23, 25–27.)

63. The Court addresses each issue in turn.

### A. Derivative Claims

64. At the time Emrich Enterprises filed the FAVC, it asserted four derivative claims against Hornwood on behalf of Triangle. (Am. Compl. ¶¶ 150–197.) Only two of Emrich Enterprises' derivative claims are now the subject of Hornwood's Motion to Dismiss: (1) breach of section 4.4 of the Operating Agreement (the First Claim for Relief); and (2) breach of fiduciary duty (the Fourth Claim for Relief). (Defs.' Reply Mem. Supp. Part. Mot. Dismiss Pl.'s First Am. Verified Compl. 2–4, ECF No. 74 ["Reply Br."].)

65. Hornwood contends that Emrich Enterprises did not comply with the pre-suit demand requirements in N.C.G.S. § 57D-8-01(a)(2) for the derivative claims encompassed in the First and Fourth Claims for Relief. (Br. Supp. 8.)

66. "The challenge to the adequacy of any pre-suit demand is, *inter alia*, a challenge to the Court's subject matter jurisdiction over the derivative claims." *Zoutewelle v. Mathis*, 2018 NCBC LEXIS 95, at *18 (N.C. Super. Ct. Sept. 13, 2018) (citation omitted). "Without a proper demand, the plaintiff has no standing to pursue derivative claims, and the trial court has no subject matter jurisdiction to hear and decide them." *Al-Hassan v. Salloum*, 2020 NCBC LEXIS 22, at *5 (N.C. Super. Ct. Feb. 20, 2020.)

67. A member of a North Carolina limited liability company may bring a derivative action only if "the member made written demand on the LLC to take suitable action, and either (i) the LLC notified the member that the member's demand was rejected, (ii) 90 days have expired from the date the demand was made, or (iii) irreparable injury to the LLC would result by waiting for the expiration of the 90-day period." N.C.G.S. § 57D-8-01(a)(2).

68. On April 29, 2019, Emrich Enterprises served Triangle with a demand letter. (Am. Compl. ¶ 115; *see also* Am. Compl. Ex. 9, ECF No. 56.9.) However, Emrich Enterprises did not wait 90 days before filing the First Complaint nor the FAVC, which were filed on April 29, 2019 and July 22, 2019 respectively. (*See* ECF Nos. 3, 56.) Emrich Enterprises also does not allege that Triangle notified Emrich Enterprises that the demand was rejected. Therefore, Emrich Enterprises did not comply with the 90-day waiting period requirement in N.C.G.S. § 57D-8-01(a)(2) when initiating this derivative action.

69. However, N.C.G.S. § 57D-8-01(a)(2) provides that the 90-day waiting period is "excused by . . . a finding of irreparable injury that would result from imposing such a waiting period." *Petty v. Morris*, 2014 NCBC LEXIS 67, at \*13–14 (N.C. Super. Ct. Dec. 16, 2014). Notably, Defendants did not move the Court to dismiss Emrich Enterprises' Third Claim for Relief for Hornwood's breach of the Operating Agreement for its threat to unilaterally withdraw from Triangle. (Br. Supp. 8–10.)

70. Emrich Enterprises alleges that Hornwood's withdrawal from Triangle, contrary to the provisions of the Operating Agreement, will cause Triangle and

Emrich Enterprises to suffer irreparable harm. (Am. Compl. ¶ 184.) Emrich Enterprises specifically alleges that, if Hornwood were to withdraw and cease its manufacturing duties owed to Triangle, all of Triangle's business would come to a halt, Triangle would not be able to meet its customers' orders, and it would destroy Triangle's customer relationships. (Am. Compl. ¶¶ 5, 106, 184.) Emrich Enterprises contends that Hornwood's withdrawal from Triangle would irreparably harm Triangle's and Emrich Enterprises' reputations and ability to obtain business from future customers or to find future business opportunities in the textile industry. (Am. Compl. ¶¶ 184–85.)

71. The Court has already concluded "that allowing Hornwood to unilaterally withdraw in breach of the Operating Agreement, and thereby extinguish its fiduciary duties, would result in irreparable harm to both Triangle and to Emrich Enterprises." (Prelim. Inj. ¶¶ 60– 64.)

72. Defendants appear to argue that Emrich Enterprises must show irreparable injury on a claim-by-claim basis, and that a showing that irreparable injury would result from a delay might be sufficient for one derivative claim but insufficient to waive the 90-day waiting period requirement for other asserted derivative claims in the same action. (Reply Br. 2–4.)

73. The statute does not require that irreparable injury stem from each claim for the plaintiff to bring the derivative action. *See* N.C.G.S. § 57D-8-01. "[N.C.G.S. §57D-8-01] does permit filing the complaint before the 90-day period expires upon a

sufficient showing of irreparable harm." *Winters v. First Union Corp.*, 2001 NCBC LEXIS 5, at *6 (N.C. Super. Ct. July 12, 2001).

74. The Court declines on the record before it to judicially impose an additional requirement on Emrich Enterprises by requiring it to show irreparable injury on a claim-by-claim basis. *See State v. Davis*, 364 N.C. 297, 302, 698 S.E.2d 65, 68 (2010) ("[C]ourts must give [an unambiguous] statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein.") (alteration in original).

75. The Court concludes that showing irreparable injury for the Third Claim for Relief is sufficient for the purposes of N.C.G.S. § 57D-8-01 to permit Emrich Enterprises to initiate its derivate action before the expiration of the 90-day waiting period. Therefore, the Court may properly exercise subject matter jurisdiction over all of Emrich Enterprises' derivative claims in the FAVC and the Motion should be DENIED to the extent it requests the Court dismiss any of Emrich Enterprises' derivative claims for lack of subject matter jurisdiction based on a failure to satisfy N.C.G.S. § 57D-8-01.

**B.     Standing to Bring Direct Claims**

76. Hornwood also challenges this Court's subject matter jurisdiction over certain direct claims brought by Emrich Enterprises against Hornwood including the First, Fourth, Seventh, and Eighth Claims for Relief. (Br. Supp. 10–16.) Generally, Hornwood argues that Emrich Enterprises does not have standing to bring these claims. (*See* Br. Supp. 10–16.)

77.    "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002) (citation omitted).  The plaintiff has the burden of proving that it has standing to bring its claims.  *Id.*  "In considering whether a member of an LLC has standing to assert an individual claim, 'members of an LLC are treated like corporate shareholders and managers are similar to directors.'" *Wirth v. Sunpath, LLC*, 2017 NCBC LEXIS 84, at *10 (N.C. Super. Ct. Sept. 14, 2017) (quoting *Levin v. Jacobson*, 2015 NCBC LEXIS 111, at *14 (N.C. Super. Ct. Dec. 7, 2015)).

78.    Generally, "shareholders cannot pursue individual causes of action against third parties for wrongs or injuries to the corporation that result in the diminution or destruction of the value of their stock." *Barger v. McCoy Hilliard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997).  However, there are two exceptions that may permit a shareholder to sue for injuries to the corporation: "(1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, and (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders." *Id.*  "These rules apply equally to LLCs and their members because the members are, for this purpose, functionally equivalent to corporate shareholders." *Bennett v. Bennett*, 2019 NCBC LEXIS 19, at *13 (N.C. Super. Ct. Mar. 15, 2019) (internal quotation marks omitted).

79.    The Court concludes that Emrich Enterprises has standing to raise its direct claims, as alleged in the First and Seventh Claims for Relief, for breach of contract based on contractual obligations owed directly to Emrich Enterprises.

80.    Section 4.4 of the Operating Agreement states that "[n]o Member may engage in or possess an interest in other business ventures of any nature or description, independently or with others, which are competitive with the activities of [Triangle], without first offering an interest in such activities to [Triangle] and each other Member." (Operating Agreement § 4.4.)  Section 4.4 imposes an obligation on Hornwood to offer an interest in business ventures that are competitive activities to Emrich Enterprises as a member of Triangle before pursing such competitive activities.  By pursuing a claim for breach of section 4.4. of the Operating Agreement, Emrich Enterprises attempts to enforce its own contractual rights.  *See, e.g., Panzino 5Church, Inc.*, 2020 NCBC LEXIS 17, at *17–18 (N.C. Super. Ct. Feb. 12, 2020).

81.    Paragraph 3(a) of the Joint Venture Agreement states that:

Either party shall invoice [Triangle], with the terms of 75 days, the cost it incurs in providing fabric, laminating, cutting and packaging for the completion of the services.  Selling expenses shall be paid on a commission basis of the 15th of the month based on the previous month's invoices.  All parties shall mutually agree upon additional expenses.[5]

(Joint Venture Agreement ¶ 3(a).)  Emrich Enterprises is a party to the Joint Venture Agreement.  (*See* Compl. ¶ 38; Joint Venture Agreement 1; *see also* Resp. Br. 17.)  Paragraph 3(a) prevents Hornwood from invoicing Triangle for additional expenses

---

[5] Paragraph 3(a) of the Joint Venture Agreement appears to include hand-written modifications which read as presented in this Order and Opinion.  (*See* Joint Venture Agreement ¶ 3(a).)

without the consent of Emrich Enterprises. By pursuing a claim for breach of paragraph 3(a) of the Joint Venture Agreement, Emrich Enterprises attempts to enforce its own contractual rights to participate in the management of Triangle. *See 759 Ventures, LLC v. GCP Apt. Inv'rs, LLC*, 2018 NCBC LEXIS 82, at *9–10 (N.C. Super. Ct. Aug. 13, 2018) (concluding that excluding a member from the LLC's management was a direct cause of action); *see also La Mack v. Obeid*, 2015 NCBC LEXIS 24, at *12–14 (N.C. Super. Ct. Mar. 5, 2015) (applying Delaware law, the Court concluded that the plaintiffs could bring a direct claim when the managers' contractual rights to vote on matters impacting the LLC were impeded).

82. When a member of an LLC seeks to enforce its own rights under the LLC's operating agreement, not the rights of the LLC, in an effort to remedy its own injury, that member has standing to bring its direct breach of contract claim. *Panzino*, 2020 NCBC LEXIS 17, at *17–18; *759 Ventures, LLC*, 2018 NCBC LEXIS 82, at *8–11. Accordingly, the Court concludes that Emrich Enterprises has standing to bring the direct breach of contract claims in the First and Seventh Claims for Relief and Hornwood's Motion as to those claims should be DENIED.

83. Hornwood also argues that Emrich Enterprises cannot assert a direct breach of fiduciary duty claim against Hornwood because, absent provisions in an operating agreement to the contrary, members of a limited liability company do not owe a fiduciary to each other and any claim brought by Emrich Enterprises should be brought as a derivative claim. (Br. Supp. 10–14; Reply Br. 4–7.) Hornwood contends that it follows that Emrich Enterprises lacks standing to assert its direct

breach of fiduciary duty claims encompassed in the Fourth and Eighth Claims for Relief. (Br. Supp. 10–13.)

84. As it pertains to the Fourth and Eighth Claims for Relief, and even if the Court applied *Barger* to the First and Seventh Claims for Relief, the Court concludes that the allegations by Emrich Enterprises satisfy, at this preliminary stage in the proceeding, the first *Barger* exception by sufficiently alleging that Hornwood is the controlling member of Triangle thus owing fiduciary duties individually and directly to Emrich Enterprises. *See Corwin*, 371 N.C. at 612, 821 S.E.2d at 734–35 (providing that whether the first *Barger* exception applied depended on whether the plaintiff sufficiently alleged that the controlling stockholder owed the plaintiff minority stockholder fiduciary duties).

85. For the aforementioned reasons, the Motion as it pertains to Emrich Enterprises' standing to bring the First, Fourth, Seventh, and Eighth Claims for Relief should be DENIED.

## C. Motion to Dismiss Pursuant to Rule 12(b)(6)

86. Hornwood requests that the Court dismiss Emrich Enterprises' First, Fourth, Fifth, and Eighth Claims for Relief for Emrich Enterprises' failure to state a claim pursuant to Rule 12(b)(6). (Br. Supp. 16–23, 25–27.)

### 1. Breach of Fiduciary Duty

87. Emrich Enterprises' Fourth and Eighth Claims for Relief assert breach of fiduciary duty claims, directly and derivatively on behalf of Triangle, against

Hornwood in its capacity as the controlling member-manager of Triangle. (Am. Compl. ¶¶ 188–97, 228–35.)

88. "The North Carolina Limited Liability Company Act does not create fiduciary duties among members." *Finkel v. Palm Park, Inc.*, 2019 NCBC LEXIS 38, at \*23 (N.C. Super. Ct. June 11, 2019) (citation and quotation marks omitted). As a general rule, "[m]embers of a limited liability company are like shareholders in a corporation in that members do not owe a fiduciary duty to each other or to the company." *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473, 675 S.E.2d 133, 137 (2009). "The rights and duties of LLC members are ordinarily governed by the company's operating agreement, not by general principles of fiduciary relationships." *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at \*10–11 (N.C. Super. Ct. Aug. 7, 2017).

89. However, in some circumstances, "a holder of a majority interest who exercises control over the LLC owes a fiduciary duty to minority interest members." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at \*17 (N.C. Super. Ct. June 19, 2019.) "Thus, when the operating agreement confers controlling authority on the majority member, [the majority member] owes a duty not to use its control to harm the minority, assuming no other provision disclaims such a duty." *Id.* at \*21.

90. Emrich Enterprises alleges that Hornwood is the majority and controlling member of Triangle. (Am. Compl. ¶¶ 2, 16, 189.) Emrich Enterprises argues that Hornwood "controls nearly every aspect of Triangle's business." (Resp. Br. 13.) Hornwood owns all of the manufacturing equipment used by Triangle and the

facilities where Triangle's products are manufactured. (Am. Compl. ¶¶ 30, 189.) Hornwood controls Triangle's day-to-day operations including its finances, customer service, administration, and its correspondence. (Am. Compl. ¶¶ 47, 189.)

91.     Furthermore, section 3.1 of the Operating Agreement states that "all decisions with respect to the management of the business and affairs of [Triangle] shall be made by action of a Majority Interest of the Members[.]" (Operating Agreement § 3.1.) Section 3.1 of the Operating Agreement confers authority on Hornwood as the majority member.

92.     Hornwood has allegedly used that control over Triangle to withhold funds owed to Emrich Enterprises, unilaterally approve unprecedented and drastic increases in the price Triangle pays to Hornwood for fabric Hornwood manufactures for and sells to Triangle, divert Triangle's profits to Hornwood, and further mismanage Triangle for Hornwood's benefit. (Am. Compl. ¶¶ 47, 51–66, 127–28, 147, 231.)

93.     Emrich Enterprises has alleged that Hornwood exercises complete control over Triangle and has used that control to harm Emrich Enterprises. The attached Operating Agreement confers controlling authority on Hornwood as the majority member and neither the Operating Agreement nor the Joint Venture Agreement address or disclaim fiduciary duties. For the purposes of a Rule 12(b)(6) motion, such allegations are sufficient to allege the existence of a fiduciary duty.[6] *See Vanguard*

---

[6] As said in *Vanguard Pai Lung, LLC*, it is important to note that the Court does not hold that Hornwood owes or owed a fiduciary duty to Emrich Enterprises. *Vanguard Pai Lung, LLC*, 2019 NCBC LEXIS 39, at *21. While the Court concludes that Emrich Enterprises has sufficiently alleged control for the purposes of a Rule 12(b)(6) motion, a more fully developed

*Pai Lung, LLC*, 2019 NCBC LEXIS 39, at *21 (concluding that for the purposes of Rule 12, the counterclaim plaintiff alleged sufficient control by the majority member over the LLC to plead the existence of a fiduciary duty when the counterclaim plaintiff made allegations that (1) the operating agreement conferred controlling authority to the majority member; (2) the majority member exercised that control; and (3) the operating agreement did not address nor disclaim fiduciary duties owed between members); *cf. Finkel*, 2019 NCBC LEXIS 38, at *27–29 (holding that, on a Rule 56 motion, the plaintiff did not establish the majority member exercised sufficient control over the LLC to find a fiduciary duty owed by the majority member to the minority member where (1) the operating agreement provided "significant protections" to the minority member; (2) the operating agreement contemplated fiduciary duties; and (3) there was undisputed evidence that there was financial transparency between the majority and minority members).

94.     Hornwood alternatively argues that, in the event the Court concludes that Emrich Enterprises sufficiently alleged a fiduciary duty owed by Hornwood to Emrich Enterprises, Emrich Enterprises nonetheless failed to allege the requisite elements of a breach of any fiduciary duty to support its claim.  (Br. Supp. 16–19.)

95.     To state a claim for breach of fiduciary duty a plaintiff must allege both that (1) the defendant owes the plaintiff a fiduciary duty through the existence of a fiduciary relationship, and (2) the defendant breached that duty.  *Surratt v. Brown*, 2015 NCBC LEXIS 75, at *19 (N.C. Super. Ct. July 27, 2015).

---

record could reveal factors that weigh against the conclusion that a fiduciary relationship existed between Hornwood and Emrich Enterprises.

96.     Emrich Enterprises alleges, among other things, that Hornwood violated the non-compete obligations of the Operating Agreement and usurped a corporate opportunity of Triangle's, caused Triangle to withhold payments that Emrich Enterprises is otherwise entitled to, and generally engaged in willful misconduct in the management of Triangle that constitutes self-dealing. (Am. Compl. ¶¶ 67–96, 191–95.) The Court concludes that these allegations are sufficient to support Emrich Enterprises' claim for breach of fiduciary duty. *See Vanguard Pai Lung, LLC*, 2019 NCBC LEXIS 39, at *3–7, 21–22 (permitting a breach of fiduciary duty claim to survive a Rule 12 motion when the controlling member diverted the LLC's money and assets to benefit itself and used its controlling authority over the LLC to harm the minority interest holder); *Shaw v. Gee*, 2016 NCBC LEXIS 103, at *18–19 (N.C. Super. Ct. Dec. 21, 2016) ("[A] manager may breach his fiduciary duty when he diverts a business opportunity that rightfully belongs to the limited liability company for his professional gain."); *SCA-Blue Ridge, LLC v. WakeMed*, 2016 NCBC LEXIS 2, at *26 (N.C. Super. Ct. Jan. 4, 2016) (concluding that the plaintiff sufficiently stated a claim for breach of fiduciary duty against the controlling member of the LLC by alleging violations of non-compete obligations in the LLC's operating agreement).

97.     For the aforementioned reasons, the Motion as it pertains to the Fourth and Eighth Claims for Relief should be DENIED.

### 2.     Breach of Contract Claims

98.     Defendants move to dismiss Emrich Enterprises' claims for breach of contract encompassed in the First and Fifth Claims for Relief pursuant to Rule

12(b)(6) for failure to state a claim. To properly plead a breach of contract claim, a plaintiff need only allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). "[S]tating a claim for breach of contract is a relatively low bar." *Vanguard Pai Lung, LLC*, 2019 NCBC LEXIS 39, at *11.

### i.    *Section 4.4 of the Operating Agreement*

99.    Hornwood, in part, contends that Emrich Enterprises' derivative and direct claims in the First Claim for Relief, for breach of section 4.4 of the Operating Agreement, should be dismissed because section 4.4 is an unenforceable non-compete provision because it is overbroad as to geographic scope and is unnecessary to protect a legitimate business interest.[7] (Br. Supp. 19–21.)

100.    Section 4.4 of the Operating Agreement states that "[n]o Member may engage in or possess an interest in other business ventures of any nature or description, independently or with others, which are competitive with the activities of [Triangle], without first offering an interest in such activities to [Triangle] and each other Member." (Operating Agreement § 4.4.)

101.    "An operating agreement is a contract," and general rules of contract construction are used to interpret an LLC's operating agreement. *N.C. State Bar v. Merrell*, 243 N.C. App. 356, 370, 777 S.E.2d 103, 114 (2015); *Comput. Design &*

---

[7] Section 4.4 of the Operating Agreement seems to incorporate both a non-compete provision and an obligation not to take the corporate opportunities of Triangle without first offering the opportunity to Triangle and its other members. (Operating Agreement § 4.4.) Primarily, the parties argue that North Carolina's law regarding non-competes govern the enforceability of this section of the Operating Agreement, therefore the Court only addresses this argument.

*Integration, LLC v. Brown*, 2018 NCBC LEXIS 216, at *25 (N.C. Super. Ct. Dec. 10, 2018). "It is the policy of the [LLC Act] to give the maximum effect to the principle of freedom of contract and the enforceability of operating agreements." N.C.G.S. § 57D-10-01.

102. "The reasonableness of a restraining covenant is a matter of law for the court to decide." *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 663, 158 S.E.2d 840, 843 (1968). "According to well-established North Carolina law, non-competition agreements contained in an employment contract are more closely scrutinized than those contained in a contract for the sale of a business." *Outdoor Lighting Perspectives Franchising v. Harders*, 228 N.C. App. 613, 620, 747 S.E.2d 256, 262 (2013) (quoting *Keith v. Day*, 81 N.C. App. 185, 193, 343 S.E.2d 562, 567 (1986)) (internal quotation marks omitted). When a non-compete provision does "not fit neatly into either the employer-employee category or the business sale category" courts should engage in a detailed analysis of the reasonableness of the restrictions rather than rigidly analyze the restrictions under one category or the other. *See Outdoor Lighting Perspectives Franchising*, 228 N.C. App. at 621–22, 747 S.E.2d at 262–63.

103. As it pertains to the relationship between a member-manager and an LLC, the Court concludes "that the facts alleged in this case do not fit squarely under the analysis applied to restrictive covenants between employer and employee or buyer and seller, but instead call for a more situation-specific approach." *KNC Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72, at *16–17 (N.C. Super. Ct. Oct. 9, 2019). The Court

in *Outdoor Lighting* addressed the reasonableness of a non-compete agreement between a franchisor and a franchisee and ultimately concluded that the elements of the tests utilized in both the employee-employer and business sale context were relevant in analyzing the reasonableness of the non-compete agreement between a franchisor and franchisee. *Id.* at 621–22, 747 S.E.2d at 263.

104. Some factors that can be considered in making the determination as to whether a non-compete is reasonable include, but are not limited to, (1) the area, or the scope of the restriction; (2) the area in which the employee actually worked or was subject to work; (3) the area in which the employer operated; (4) the nature of the business involved; (5) the nature of the employee's duty and his knowledge of the employer's business operation; and (6) the good will of the business. *Outdoor Lighting Perspectives Franchising*, 228 N.C. App. at 622–23, 747 S.E.2d at 263–64 (citing *Clyde Rudd & Assocs., Inc. v. Taylor,* 29 N.C. App. 679, 684, 225 S.E.2d 602, 605 (1976)).

105. However, the FAVC and the Operating Agreement attached thereto do not adequately address these factors. The North Carolina Court of Appeals has previously held that "a ruling on the enforceability of [a non-compete agreement] cannot be made at the pleadings stage in cases where evidence is needed to show the reasonableness of the restrictions contained therein. *See Mkt. Am., Inc. v. Lee*, 257 N.C. App. 98, 110, 809 S.E.2d 32, 41 (2017) (citing *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 96, 638 S.E.2d 617, 618 (2007)). Section 4.4 of the Operating Agreement is not *per se* unreasonable. *See Jewel Box Stores Corp.*, 272 N.C. at 663–64, 158 S.E.2d at 843–44 ("[T]his Court has upheld covenants not to compete which

accompanied the sale of a trade or business and contained limitations of ten, fifteen, and twenty years, as well as limitations for the life of one of the parties[.]"); *Biesse Am., Inc. v. Dominici*, 2019 NCBC LEXIS 50, at *24 (N.C. Super. Ct. Aug. 19, 2019) ("A worldwide covenant not to compete is not *per se* invalid.") (emphasis added).

106. The determination as to whether section 4.4. of the Operating Agreement is enforceable should be made on a more fully developed record. *See Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *39 (N.C. Super. Ct. Nov. 3, 2011).

107. At the pleading stage, Emrich Enterprises' allegations that (1) Hornwood and Emrich Enterprises agreed to the provisions of the Operating Agreement; (2) Hornwood and Borgstena developed a business relationship to develop automotive fabrics; (3) Borgstena is a competitor of Triangle; (4) Hornwood and Borgstena's efforts are competitive with Triangle's business activities; and (5) Hornwood did not offer this business opportunity to Triangle or Emrich Enterprises and actively concealed such work, are sufficient to state a claim for breach of contract. (Am. Compl. ¶¶ 152–57.) Accordingly, Hornwood's Motion should be DENIED subject to the Court's ability to more fully consider the reasonableness of the restriction contained in the Operating Agreement upon a more fully developed record.

### ii. Agreement to Distribute Settlement Proceeds

108. Emrich Enterprises asserts the Fifth Claim for Relief on the basis that Triangle breached the parties' agreement to distribute the settlement proceeds from the Lawsuit. (Am. Compl. ¶¶ 199–205.) In large part, Triangle contends that Emrich Enterprises' Fifth Claim for Relief must fail because Emrich Enterprises cannot

require Triangle to distribute funds where doing so would result in Triangle's liabilities exceeding its assets. (Br. Supp. 25–27; Reply Br. 11–13.) In its argument, Triangle references facts that are not part of the FAVC nor the documents attached thereto. The Court therefore declines to consider this argument or the extraneous facts provided on a Rule 12(b)(6) motion nor will the Court convert the Motion into one for summary judgment pursuant to Rule 56.

109. Based on the allegations made in the FAVC regarding the agreement to distribute the settlement proceeds and the terms of the attached Operating Agreement, there is no inherent conflict between the agreements' respective terms. Therefore, the Court need not determine whether the express agreement between the parties regarding the settlement proceeds, the Operating Agreement, or both govern the dispute at issue at this stage in the proceeding. *See Vanguard Pai Lung, LLC*, 2019 NCBC LEXIS 39, at \*15 (citing *Roth v. Penguin Toilets, LLC*, 2011 NCBC LEXIS 46, at \*12 (N.C. Super. Ct. Nov. 30, 2011)).

110. Emrich Enterprises has sufficiently alleged that Triangle, Emrich Enterprises, and Hornwood agreed that Triangle would distribute the Lawsuit's settlement proceeds in certain amounts and at certain times and Triangle has refused to pay Emrich Enterprises' its share of the settlement proceeds as required by the alleged agreement, which is sufficient for the purposes of Rule 12(b)(6). (Am. Compl. ¶¶ 199–204.) Therefore, Triangle's Motion should be DENIED.

## VI.       CONCLUSION

111.   For the foregoing reasons, the Court hereby **DENIES** the Motion.


**SO ORDERED**, this the 8th day of April, 2020.


/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases